Antonio CLARK *v.* STATE of Arkansas

CR 77-198                                              573 S.W. 2d 622

Opinion delivered November 27, 1978
(In Banc)

632

*Roberts & Kesl,* by: *Marjorie M. Kesl,* for appellant.

*Bill Clinton,* Atty. Gen., by: *Joseph H. Purvis, Deputy Atty. Gen., for appellee.*

FRANK HOLT, Justice. A jury found appellant guilty of two counts of capital felony murder and assessed his punishment at death by electrocution on each conviction. Appellant first contends that the court committed reversible error by denying him his right to allocution under Ark. Stat. Ann. § 43-2303 (Repl. 1964). The statute provides that "[w]hen the defendant appears for judgment . . . . he must" be asked (by the court) "if he has any legal cause to show why judgment should not be pronounced against him." Here the trial court did not use that specific language. He asked appellant, in the presence of court appointed counsel: "Do you have anything that you wish to say?" In response, the appellant replied: "I am sorry for what happened. I never did shoot anyone. This is all I would like to say about that. I would like to put my appeal in." The court: "You will be granted an appeal." Counsel: "I explained to him that we will appeal after the judgment is entered." Then in response to the court's inquiry, "You understand everything that is going on?", appellant replied: "Yes, sir, I understand." The court then stated that the judgments and sentences he had imposed are "subject to the agreement between the State of Arkansas and

the State of Michigan" and the commitment would so provide. Further, appellant would be returned to Michigan where he was serving a life sentence for murder plus forty to sixty years on assault with intent to murder. The sentencing was approximately one week following the trial. At sentencing, appellant agreed that he had "waived, by your attorney, and agreed that your judgment could be pronounced here in Dewitt where you were charged rather than in Lonoke County."

The purpose of a statute such as ours is to give the accused, upon sentencing, an opportunity to show any cause why sentence should not be pronounced. Where a question is addressed to the defendant which affords him an opportunity to express why sentencing should not be pronounced, it is unnecessary that the precise language of the statute be used. *People ex rel. Bester* v. *Johnston*, 9 A.D. 2d 827, 192 N.Y.S. 2d 947 (1959); *Valdez* v. *State*, 479 S.W. 2d 927 (Tex. Crim. App. 1972); and 24 C.J.S. Criminal Law § 1576 (b). Here the question asked by the court upon sentencing of the appellant gave him the unfettered right to state any cause, legal or otherwise, as to why sentence should not be pronounced. The appellant's response was not restricted in any manner. He was assured of his right of appeal, as an indigent, by the court and that the sentences were subject to the agreement that he would be returned to Michigan where, as indicated, he was serving two sentences. Appellant was present with counsel at the sentencing and there was no objection to the procedure. Neither has any objection been raised by a motion for a new trial, which is permissible. *Finch* v. *State*, 262 Ark. 313, 556 S.W. 2d 434 (1977). We have held that in capital cases it is necessary to make an objection in the trial court in order to raise the issue on appeal. *Hulsey* v. *State*, 261 Ark. 449, 549 S.W. 2d 73 (1977), cert. den., ____ U.S. ____, 99 S. Ct. 220, 58 L. Ed. 2d 194 (1978). We further observe that here on appeal, although raised for the first time, there is no suggestion of any prejudice other than the court did not follow the exact wording of the statute. Upon a review of the entire sentencing procedure, we are of the view no prejudicial error as to allocution is demonstrated. See *Tate* v. *State*, 258 Ark. 135, 524 S.W. 2d 624 (1975).

Appellant next contends that the imposition of two

death penalties constitutes cruel and unusual punishment. The death penalty per se is not violative of our Federal Eighth and Fourteenth Amendments. *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976); *Proffitt v. Florida*, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976); *Jurek v. Texas*, 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976); *Collins v. State*, 261 Ark. 195, 548 S.W. 2d 106 (1977), cert. den. 429 U.S. 808, 98 S. Ct. 231, 54 L. Ed. 2d 158 (Oct. 3, 1977); and *Pickens v. State*, 261 Ark. 756, 551 S.W. 2d 212 (1977). The cumulative effect of consecutive sentences does not make the punishment cruel and unusual. *Hinton v. State*, 260 Ark. 42, 537 S.W. 2d 800 (1976). Here appellant was convicted of two felony murders and received the death sentence in each, as authorized by statute for each offense, which is not so disproportionate to the nature of the offense as to shock the moral sense of the community. See *Hinton v. State*, *supra*.

Appellant also contends that the trial court erred in admitting into evidence a tape recorded statement which he asserts was involuntarily given. A Denno hearing was held concerning appellant's motion to suppress the statement, and the trial court ruled that it had been voluntarily made and was admissible in relevant part. Appellant argues that the statement was involuntary in that he was interrogated in Detroit by three officers who induced him to make the statement by their promises that he would not be returned to Arkansas for trial if he gave them a statement. Where a confession is made when in custody, the state bears the burden of proving it was voluntary. *Giles v. State, supra.* When the voluntariness of a confession is challenged, we make an independent determination of the issue from a review of the entire record looking at the totality of the circumstances but will not set aside a finding of voluntariness unless such is clearly against the preponderance of the evidence. *Tucker v. State,* 261 Ark. 505, 549 S.W. 2d 285 (1977).

Appellant was twenty-one years of age and had a tenth or eleventh grade education. At the Denno hearing, appellant testified that the police in Detroit, where he was apprehended, promised him that if he made the statement they would not return him to Arkansas for trial. Otherwise, he would be returned. Appellant's testimony was contradicted by the

three officers conducting the interrogation. See *Smith* v. *State,* 254 Ark. 538, 494 S.W. 2d 489 (1973); and *Northern* v. *State,* 257 Ark. 549, 518 S.W. 2d 482 (1975). Here it appears that all material witnesses testified that at no time were any promises or threats made to appellant to elicit his confession; it was freely and voluntarily given; appellant was not in their opinion under the influence of any drugs or alcohol; appellant was informed of his right to remain silent; any statement he made could be used against him in court; he had a right to have retained or appointed counsel present; and he could exercise his right to remain silent at any time. Appellant signed a Constitutional Rights Certificate of Notification form which corroborated the officers' testimony.

Additionally, the tape recording and transcription of the interrogation, which were presented at the Denno hearing, indicate that prior to the giving of the statement, appellant was informed of all his constitutional rights. Appellant stated that he understood his rights and waived them; he had not been threatened or promised anything; and was not under the influence of drugs or alcohol. Here we cannot say the court's finding of voluntariness was clearly against the preponderance of the evidence. Further, we observe that appellant, when testifying at trial, denied only that part of his statement that he, rather than one of his confederates, fired the pistol.

Appellant finally contends that the jury was prejudiced by the admission of evidence of a rape committed by him during the robbery which aroused the jury's passion and resulted in their imposition of the death penalty. The state adduced evidence that appellant with two confederates, Gooch and Pickens, entered a rural grocery store, robbed the proprietor, raped an employee, killed two of the customers, and wounded five others. The full details are narrated in *Pickens* v. *State, supra,* where we affirmed his death sentence. Here the appellant, testifying in his own behalf, admitted raping the store employee and participating in the robbery. However, he denied the actual shooting of any of the victims. All of these activities constitute one continuous criminal episode. Appellant was charged with two counts of felony murder in the perpetration of a robbery and rape. The evidence of the rape was admissible as a contemporaneous part of the crim-

inal episode. *Russell & Davis* v. *State*, 262 Ark. 447, 559 S.W. 2d 7 (1977); *Harris* v. *State*, 239 Ark. 771, 394 S.W. 2d 135, *cert. den.* 386 U.S. 964, 87 S. Ct. 1043, 18 L. Ed. 2d 114.

Ark. Stat. Ann. § 43-2725 (Repl. 1977) and Ark. Stat. Ann. Vol. 4A, Rules of Crim. Proc., Rule 36.24 (Supp. 1977) require that we "review the entire record for errors prejudicial to the right of an appellant in capital cases." After compliance with this requirement, it was suggested in conference there was a violation of appellant's constitutional rights by the trial court when he struck prospective jurors for cause because of their inability to consider the imposition of the death penalty had they, as jurors, found the appellant guilty. *Witherspoon* v. *Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), provides in pertinent part:

> The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided for by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. . . .

Here the trial court struck five prospective jurors for cause due to their inability, as jurors, to consider the imposition of the death penalty. Prospective juror Lucas told the court that if she were selected as a juror, she could not impose the death penalty under any circumstances. Prospective jurors Young and Pettus responded in a like manner as to the imposition of the death penalty. Prospective juror Harris responded that she did not believe she could consider the death penalty because it is contrary to the way she thinks. She was equivocal and finally answered that she didn't believe she could impose the death penalty under any circumstances nor did she think she could even consider it. Prospective juror Thrift was struck for cause when she responded that unless she saw the crime committed, she would not consider the imposition of the death penalty. In our view there was sufficient compliance with the requirements of *Witherspoon* v. *Illinois, supra.*

Further, it is significant that no objections were raised to

the court's striking these jurors for cause. Failure to interpose an objection or raise the issue in a motion for a new trial prevents the issue from being raised for the first time on appeal in a capital case. *Neal* v. *State*, 259 Ark. 27, 531 S.W. 2d 17 (1975); *Finch* v. *State, supra; Hulsey* v. *State, supra.* See also *Estelle* v. *Williams*, 425 U.S. 501, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976); and *Francis* v. *Henderson*, 425 U.S. 536, 96 S. Ct. 1708, 48 L. Ed. 2d 149 (1976) to the effect that failure of a criminal defendant to object precludes review of the issue on appeal. Here, as indicated, there was no objection to the court's excusing any of these jurors for cause. Neither was the issue raised in a motion for new trial. In another very recent case, it was held that objections must be made at trial in order to preserve for appellate review errors of constitutional dimensions. *Boulware* v. *State*, 542 S.W. 2d 677 (Tex. Crim. App. 1976); cert. den. 430 U.S. 959, 97 S. Ct. 1610, 51 L. Ed. 2d 811 (1977). There it was specifically held in a capital case that "the failure to object to the improper exclusion of a venire member waives that right and it cannot be considered on appeal." Therefore, "absent an objection," it was not error when the trial court excused the jurors for cause "even though they were not questioned as thoroughly as they might have been with reference to their ability to render the death penalty no matter what the trial may reveal." This view was reaffirmed in *Shippy* v. *State*, 556 S.W. 2d 246 (Tex. Crim. App. 1977); cert. den. 434 U.S. 935, 54 L. Ed. 2d 294 (1977).

Here after reviewing the entire record, as required by § 43-2725, *supra,* and Rule 36.24, *supra,* and finding no errors prejudicial to appellant, the judgments are affirmed.

Affirmed.

HOWARD, J., dissents.

GEORGE HOWARD, JR., Justice, dissenting. I am compelled to dissent in this case inasmuch as there were jurors who were excluded from serving on the jury that convicted the appellant simply because they voiced general objections to the death penalty or expressed conscientious scruples against its infliction. The action of the trial court in excluding these jurors conflicts with the holding of the United States Supreme

Court in reversing the death sentence in the case of *Wither-spoon* v. *Illinois*, 391 U.S. 510, where the Court stated:

> ". . . Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected.

> "Whatever else might be said of capital punishment, it is at least clear that its imposition by a hanging jury cannot be squared with the Constitution. The State of Illinois has stacked the deck against the petitioner. To execute this death sentence would deprive him of his life without due process of law."

The following is an exchange between the prosecuting attorney, the court and prospective jurors regarding their position on the death sentence resulting in the exclusion of the jurors from serving by the court which does not square with the *Witherspoon* doctrine:

MRS. BOBBIE HARRIS, Juror:

> "Q. Ma'am, this is a murder case, two counts of murder, and one of the penalties in it is the death penalty and that is what I am going to be asking for. I am going to be asking the jury if they find this man guilty, I am going to ask them to put him in the electric chair and turn the juice on him until he dies. The shock goes all through him.

> THE COURT: Let's quit getting so _____. You are trying to prejudice this juror.

MR. BAYNE: No, sir, I am not.

Q  Could you consider, if you were a juror, could you consider the death penalty?

A   No, sir, I don't believe I could.

Q   Could you consider it in any kind of case? Are there any circumstances where you could give the death penalty?

A   No.

Q   Is it against your religion, your way of thinking?

A   It is against the way I think.

Q   You couldn't give that as a penalty?

A   I don't believe so.

MR. BAYNE: Judge I challenge her.

THE COURT: Mrs. Harris, if you were selected as a juror and the evidence convinced you beyond a reasonable doubt that this defendant was guilty, would you consider all of the punishments that are provided by law for the crime that he is charged with?

JUROR: That he was proved guilty of —

THE COURT: If you determine in your own mind that he is guilty from the evidence you have heard, would you then consider all of the punishments that you could impose, that you could give him. One of them being death, one of them life without parole, one of them just straight life or one five to fifty years. Would you consider all of those punishments before you made your mind up which one you wanted to give him?

JUROR: I don't believe I could.

THE COURT: Ma'am.

JUROR: I don't believe I could give him the death penalty.

THE COURT: Regardless of what the cir-

cumstances were. In other words, would you go in there now — would you say now, not even knowing what the facts are going to be, would you say that I am not going to give anybody the death penalty. I am talking about before you hear the evidence.

JUROR: Well, I don't know. I don't think I could.

THE COURT: You just don't think you could give the death penalty under any circumstances. You have got your mind already made up that you are not going to give the death penalty?

JUROR: No, sir, I haven't made my mind up.

THE COURT: Well, would you consider giving the death penalty if you found the man to be guilty as charged from the evidence you heard from the witness stand.

JUROR: I guess so.

THE COURT: You would consider giving him the death penalty or would you say, no, I am not going to give anybody the death penalty. I don't care what he did. Now, you are the only one that can answer that question, Mrs. Harris. That's the reason I am asking you.

JUROR: I don't believe I could.

THE COURT: You wouldn't even consider giving it.

JUROR: No, sir, I don't think I could.

THE COURT: Okay. The Court will excuse you."

MRS. MARTHA YOUNG, Juror:

"Q Do you have moral, ethical or religious beliefs against giving the death penalty?

A   Yes, sir.

MR. BAYNE: Challenge for cause Your Honor.

THE COURT: Mrs. Young, would you even consider all the punishments that are provided by law if you found this man guilty of the crime. In other words if you found him guilty, after you listened to the evidence and you found him guilty, would you consider all of the possible punishments which would include the death penalty?

JUROR: Could I answer by just saying I really don't know.

THE COURT: Let me ask you another way then. Can you right now, before you hear any evidence in this case made (sic) up your mind that you would not vote for the death penalty regardless of what the evidence turned out to be?

JUROR: I might. I have just been through a terrible experience. I have just lost my husband. I really don't know what I think. I might. I just might not believe in capital punishment.

THE COURT: But under no circumstances would you vote for the death penalty even if you were convinced that the man was guilty, from the evidence, guilty of the crime charged. You would not even consider giving him the death penalty?

JUROR: No, sir.

THE COURT: You would not. The Court will excuse you then, Mrs. Young.''

MRS. CORINE LUCAS, Juror:

"Q   I am not required by law but I feel I should ask this question. If you were selected as a juror, to sit on the jury, would you, before the trial ever started and no witnesses had been called, would you automatically

eliminate giving the death penalty regardless of any evidence that you heard during the trial?

A   No.

Q   You would not automatically vote against it?

A   No, sir.

.   .   .

Q   I am going to be asking for the death penalty. In Arkansas the death penalty is carried out by electrocution. Did you know that?

A   Yes, sir, I understand that.

Q   And they hook them up and the juice goes all through them like that? Now, could you vote—

A   No, sir, No, sir, I can't.

Q   You see what I mean?

A   No, sir, I couldn't do that.

Q   Regardless of what he did you just couldn't vote for it?

A   I couldn't do that.

MR. BAYNE: Challenge for cause, Your Honor.

THE COURT: Just a minute. Let me ask you these questions, Mrs. Lucas. They are basically the same as Mr. Bayne's. If you are selected as a juror in this case, would you consider all punishments provided by law if you found the defendant guilty?

JUROR: Yes.

THE COURT: You would consider all the punishments?

JUROR: Un huh.

THE COURT: The law might provide a five year sentence or a life sentence or death. Would you consider all of those sentences if you found the defendant guilty before you finally arrived at which punishment you elected to give? Would you do that? Would you consider all of them?

JUROR: Yes, sir.

.   .   .

THE COURT: You would go into the jury box and just automatically say I wouldn't give — before you heard any of the evidence — you have made up your mind already. Is that correct?

JUROR: Yes, sir.

THE COURT: I will excuse you for cause."

In *Witherspoon,* thirty-nine veniremen, including four of the six who indicated that they did not believe in capital punishment, had acknowledged having conscientious or religious scruples against the infliction of the death penalty or against its infliction in a proper case and were excluded without any effort being made to find out whether their scruples would invariably compel them to vote against capital punishment.

One venireman who admitted to a religious scruple against the death penalty when asked: "You don't believe in the death penalty?" She replied: "No." But later she stated she had no religious scruples against capital punishment and further stated that she would not "like to be responsible for . . . deciding somebody should be put to death." She was excused.

In *Maxwell v. Bishop, Penitentiary Superintendent,* 398 U.S. 262, the United States Supreme Court, in reversing the

Arkansas Supreme Court's affirmance of Maxwell's death sentence,[1] stated:

"As was made clear in *Witherspoon*, 'a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.' . . . "

In *Maxwell*, one prospective juror was successfully challenged for cause solely on the basis of the following exchange:

"Q. If you were convinced beyond a reasonable doubt at the end of this trial that the defendant was guilty and that his actions had been so shocking that they would merit the death penalty do you have any conscientious scruples about capital punishment that might prevent you from returning such a verdict?

"A. I *think* I do." (Emphasis supplied)

Still another member of the panel was dismissed after the following dialogue:

"Q. Mr. Adams, do you have any feeling concerning capital punishment that would prevent you *or make you have any feelings about* returning a death sentence if you felt beyond a reasonable doubt that the defendant was guilty and that his crime was so bad as to merit the death sentence?

"A. No, I don't believe in capital punishment." (Emphasis supplied)

In the instant case, veniremen were excused from serving on appellant's jury for reasons essentially similar to the ones quoted above in *Maxwell*.

In *Davis* v. *Georgia*, 429 U.S. 122, 97 S. Ct. 399 (1976),

---

[1]*See: Maxwell* v. *State*, 236 Ark. 694, 370 S.W. 2d 113.

the United States Supreme Court made the following comment in reversing the conviction of a death sentence:

> ". . . Unless a venireman is 'irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings' . . . he cannot be excluded; if a venireman is improperly excluded even though not so committed, any subsequently imposed death penalty cannot stand."

In *Davis*, only one prospective juror had been excluded in violation of the *Witherspoon* standard.

The majority, in addition to rejecting the doctrine in *Witherspoon* in this case, further asserts another reason for not applying the *Witherspoon* doctrine in the instant case by asserting:

> "Further, it is significant that no objections were raised to the court's striking these jurors for cause. Failure to interpose an objection or raise the issue in a motion for a new trial prevents the issue from being raised for the first time on appeal in a capital case."

But, on the other hand, the majority concludes its opinion by asserting the following:

> "Here after reviewing the entire record, as required by § 43-2725, *supra,* and Rule 36.24, *supra,* and finding no errors prejudicial to appellant, the judgments are affirmed."

Upon reviewing Ark. Stat. Ann. § 43-2725 and Arkansas Criminal Rule 36.24, set out below, it is obvious that the majority is pursuing a contradictory course when it says that the Court may not consider the *Witherspoon* issue because counsel for appellant made no objections to the exclusion of the jurors:

Ark. Stat. Ann. § 43-2725 provides as follows:

> "The Supreme Court need only review those

matters briefed and argued by the appellant *provided that where either a sentence for life imprisonment or death, the Supreme Court shall review all errors prejudicial to the rights of the appellant.*" (Emphasis supplied)

Arkansas Criminal Rule 36.24 provides:

"The Supreme Court need only review those matters briefed and argued by the appellant *provided that where either a sentence for life imprisonment or death was imposed, the Supreme Court shall review the entire record for errors prejudicial to the right of the appellant.*" (Emphasis added)

Moreover, the failure of counsel to object to the exclusion of the jurors who manifested scruples against the death penalty was not dispositive of the *Witherspoon* issue, and accordingly, this Court is empowered under law to consider the issue whether there was an objection registered or not, for the following provisions make this crystal clear:

Rule 102 of the Uniform Rules of Evidence provides as follows:

"These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence, to the end that the truth may be ascertained and proceedings justly determined."

Rule 103(a) (1) of the Uniform Rules of Evidence provides:

"(1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the contest; . . ."

Rule 103 (2) (d) of the Uniform Rules of Evidence provides:

"(d) Errors Affecting Substantial Rights. Nothing in this rule precludes taking notice of errors affecting

substantial rights although they were not brought to the attention of the court."

Accordingly, I would reverse and remand this case for a new trial because of the improper exclusion of jurors under the doctrine of *Witherspoon* v. *Illinois,* supra.