Robert M. THOMPSON *v.* STATE of Arkansas

CR 82-133                                    658 S.W.2d 350

Supreme Court of Arkansas
Opinion delivered September 26, 1983

*Jack T. Lassiter,* for appellant.

*Steve Clark,* Atty. Gen., by: *Victra L. Fewell,* Asst. Atty. Gen., for appellee.

RICHARD B. ADKISSON, Chief Justice. The appellant, Dr. Robert Thompson, was convicted of twenty separate offenses of carnal abuse occurring over a two-year period. The jury returned a verdict fixing his sentence at the statutory maximum of ten years imprisonment and a ten thousand dollar fine for each charge. At a separate sentencing hearing, the circuit judge ordered the sentences to run consecutively for a total of 200 years imprisonment and a $200,000.00 fine.

Appellant first argues that the evidence was insufficient to support the conviction. The victim, a child of barely

twelve years, was taken by his father, Lynn Ross Wilmoth, known as Moe, to appellant's house February 24, 1980, where appellant engaged in carnal abuse with him. The victim identified appellant and testified that his father had taken him there on 19-20 occasions from February, 1980, through January, 1982. He further testified that of those 19-20 occasions there were three or four times he did not have sex with appellant. Over this two year period, Richard Purifoy and other men were sometimes present at appellant's house. As many as four or five different men were involved. The victim testified he had sex with the other men, but appellant always went first. The sexual acts the victim engaged in with appellant were sodomy, fellatio, and an act wherein one person uses his fist in a sexual way in the anus of another person. The victim identified a photograph depicting appellant having anal intercourse with him. The victim identified three other photographs depicting various sexual activity between him and appellant and testified the photographs were taken by appellant over the two year period. On one occasion he and his father stayed at appellant's house all night. During the time that he engaged in sexual activities with appellant, his father either watched, watched a movie, or masturbated. The victim testified he did not enjoy the sex acts but participated in them because he was scared of his father who had whipped him, beat him, and abused him sexually. Finally, in February, 1982, he ran away from home. At the time of trial he was living in a foster home.

The victim's testimony that he engaged in sex with appellant at least sixteen times is substantiated by names and notations in appellant's handwriting on calendars and in a notebook minutely documenting his sex life. The evidence was sufficient to support appellant's conviction for 16 of the 20 offenses. We therefore reverse and dismiss four of the twenty convictions.

Second, appellant argues that the penalties imposed on appellant violate both the United States and Arkansas constitutional prohibitions against cruel and unusual punishment. U.S. Const. amend. VIII; Ark. Const. art. 2 § 9. The Eighth Amendment of the United States Constitution,

applicable to the States through the Fourteenth Amendment, prohibits not only barbaric punishments but also sentences that are disproportionate to the crime committed. *Weems* v. *United States,* 217 U.S. 349, 367 (1910).

The United States Supreme Court has recently stated that the type of inquiry a court should conduct to determine if a given sentence is constitutionally disproportionate is a case-by-case determination. *Solem* v. *Helm,* ___ U.S. ___, 103 S.Ct. 3001, 3012 (1983). The court in *Solem* further states:

> [a] court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.

*Id.,* 3010-11.

For a determination of the gravity of the offense, the court notes that comparisons can be made both in the light of the harm caused or threatened to the victim or society and in a consideration of the culpability of the offender. For example, nonviolent crimes are less serious than violent ones; stealing a million dollars is more serious than stealing a hundred dollars. As to the culpability of the offender, a court may consider the defendant's intent or lack of intent and his motive in committing a crime. *Id.,* at 3011. The court in *Solem* adds that the above list of criteria for comparing the severity of different crimes is not meant to be exhaustive. *Id.*

Counsel for appellant argues that the offenses committed by appellant were nonviolent, that neither force nor coercion were used against the victim, and that appellant posed no particular threat to society. Counsel also points out that given appellant's age, he has in effect received a life sentence, a punishment concomitant to that imposed for murder in the first degree and other violent crimes. Even though appellant's crimes involved no violence, they were

crimes against a young person. Given the victim's testimony that he did not enjoy these acts and was afraid of his father, it could not really be said that his participation was consensual.

The sexual abuse of children is an abhorrent crime which clearly poses a threat to society. Appellant was found guilty by the jury which imposed the maximum penalty on each count. The trial court in turn exercised its discretion to order the sentences to be served consecutively. We have previously stated that the cumulative effect of consecutive sentences does not make punishment cruel and unusual. *Clark* v. *State*, 264 Ark. 630, 634, 573 S.W.2d 622, 624 (1978); *Hinton* v. *State*, 260 Ark. 42, 48, 537 S.W.2d 800, 804 (1976). We do not find the cumulative sentence of 160 years imprisonment and $160,000 fine to be barbarous, outside the law, or wholly disproportionate to the nature of the offense charged.

Third, appellant argues that the trial court erred in holding the affidavit sufficient to support the issuance of the search warrant. We do not agree. Heretofore, the Arkansas Supreme Court has applied the two-prong test of *Aguilar* v. *Texas*, 378 U.S. 108 (1964) codified at A.R.Cr.P. 13.1 (b). *State* v. *Prue*, 272 Ark. 221, 225, 614 S.W.2d 221, 223, *cert. denied*, 454 U.S. 863 (1982). The affidavit must reflect 1) some underlying circumstance showing the reliability of the informant and 2) some underlying circumstance from which the informant concluded that the items to be seized were where he said they were. Among the circumstances set forth in the affidavit indicating the reliability of the informant were: the informant's correct information as to the appellant's profession, place of employment and residence; the description of the young white male and the older white male later determined to be the victim and his father, Lynn Wilmoth, known as Moe; the positive identification of Lynn Wilmoth from a photographic spread of six unknown white males; and the informant's admission to engaging in sodomy with appellant, an admission against interest which would subject him to criminal liability. Among the circumstances indicating that the items to be seized were located where the informant had said were: the informant's

possession of a key to the residence given him by appellant; and his intimate knowledge of the residence indicated by a sketch he had drawn.

The United States Supreme Court recently enunciated a new test for the review of search issues where an officer obtains a search warrant on the basis of an informant's statement. The new test is a totality of the circumstances test whereby the issuing magistrate is to make a practical, common sense decision based on all the circumstances set forth in the affidavit. *Illinois* v. *Gates,* 103 S.Ct. 2317, 2332 (1983). Here, the affidavit meets both the *Aguilar* two-prong test and the new totality of the circumstances test. In the future we adopt and will apply the new, more flexible, totality of the circumstances test as is now permissible under *Illinois* v. *Gates.*

Fourth, appellant argues that certain testimony should have been excluded pursuant to Unif. R. Evid. 403. Defense counsel objects to the admission of evidence that the victim's father was playing with his penis while appellant committed these offenses. We find that Wilmoth's actions were part of the *res gestae* and are presumptively relevant and admissible. There is no showing of unfair prejudice to appellant by the admission of this evidence.

Fifth, appellant argues that the State failed to comply with A.R.Cr.P. 17.1 (a) (1) in that the State did not notify defense counsel that Richard Purifoy would be a witness until a few days before trial. Purifoy had been a co-defendant of appellant and had apparently entered into an agreement to plead guilty and to testify. The record reflects that defense counsel were informed that all co-defendants were potential witnesses. In light of this fact, we find no prejudicial error.

Affirmed in part, reversed in part.

PURTLE, J., concurs.

HOLT, J., dissents.

JOHN I. PURTLE, Justice, concurring. Apparently this court has abandoned its old policy of not issuing advisory

opinions set out in *Stafford* v. *City of Hot Springs,* 276 Ark. 466, 637 S.W.2d 553 (1982). In *McCuen* v. *Harris,* 271 Ark. 863, 611 S.W.2d 503 (1981) we stated we would not answer academic questions. I have advocated giving advisory opinions under certain special and limited circumstances but the majority has steadfastly refused until today to follow this course.

It was not necessary for the majority to include in its opinion the ruling handed down by the U.S. Supreme Court in *Illinois* v. *Gates,* ___ U.S. ___ , 103 S.Ct. 2317 (1983) nor do I consider it proper to state what tests this court will utilize in the future. The majority clearly states that the affidavit in the present case meets the two-prong test of *Aguilar* and *Spinelli.* However, since the matter has been gratuitously thrown in I will comment. The exclusionary rule is predicated on the 4th Amendment to the Constitution of the United States of America, which was finally ratified December 15, 1791, almost 200 years ago. The 4th Amendment states in part:

> [N]o warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The 4th Amendment was written because the framers of the Constitution despised the general searches and seizures existing in England at the time. General searches had also been conducted in the colonies by the government of England through what were known as writs of assistance. These writs generally authorized certain officials to search wherever they chose in attempting to locate goods which had been illegally smuggled into the colonies. Many of the warrants were attempts to quiet seditious publications and to put the publishers out of business. The people who framed our Constitution and the Bill of Rights thought they were protecting American citizens in providing that their papers, goods, and persons would be free from intrusion by those who would not observe or did not agree with their ideas. It was the 4th Amendment which gave rise to the fact that "a man's home is his castle." Any search of a person, his

premises or possessions is obnoxious and a hinderance to his liberty. Our 4th Amendment wisely states that search warrants must be supported by oath or affirmation which particularly describe the place to be searched and the persons or things to be seized. This was to eliminate the general search. Any departure from this mandate is a taking away of the rights of all the people. The step the majority takes today may be the first step in the destruction of the 4th Amendment to the Constitution of the United States of America. To this end I will not be a part.

The anonymous informant in the *Gates* case merely supplied tips which were followed up by the officers and found to be true. So far as I know it has never been considered improper or illegal for police officers to investigate any tip received by them, whether reliable or not. The *Gates* opinion did not even hint that a tip from an unknown informant would support "probable cause" sufficient to justify the issuance of a warrant by a magistrate. In fact the court stated, "We agree with the Illinois Supreme Court that an informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report." The opinion further held that the Illinois court seemed to imply all of the foregoing relative factors were to be rigidly applied.

A.R.Cr.P., Rule 1.2 states: "These rules shall govern the proceedings in all criminal cases in the Supreme Court and in circuit courts of the State of Arkansas." It is not the duty of this court to set forth tests which are to be used in the future, but rather, the existing rules are to be applied in the cases which come before us. This court has adopted rules relating to the issue of search and seizure. A.R.Cr.P., Art. IV. We are bound by our rules until such time as they are changed. A.R.Cr.P., Rule 13, specifically describes the circumstances upon which a search warrant may be issued. This rule has adequate protection for the public and plenty of authority for granting a search warrant within the confines of the 4th Amendment to the U.S. Constitution. I believe our rules conform to the requirements of *Aguilar* and *Spinelli* and would validate a warrant in circumstances such as *Gates* without the necessity of chipping away at the Constitution.

A.R.Cr.P., Rule 13.1 (b) provides that the application for a search warrant shall meet a test as rigid as the test in *Aguilar.* We have no right to abrogate our own rule in favor of one offering less protection to our citizens. We are not bound to follow a decision of the U.S. Supreme Court which is more restrictive than our own rules and statutes.

An anonymous informant is a person who is unwilling to appear before a magistrate or other official and give a sworn statement in support of his allegation. The word anonymous by definition implies nothing is known about the person's "veracity," "reliability" or "basis of knowledge." In the absence of information that an anonymous informer would in some manner suffer harm or injury if his identity were revealed I would treat such information as being worthy only of being checked out. Information from a nameless, faceless individual about whom we know nothing concerning personal honesty and integrity is not sufficient within itself to support the issuance of a search warrant. To so act upon the unverified tip of an unknown informant is a step in the direction of the despicable general search warrant. Justice Douglas stated in a dissenting opinion in *Draper* v. *United States,* 358 U.S. 307 (1959): "A rule protective of law-abiding citizens is not apt to flourish where its advocates are criminals. Yet the rule we fashion is for the innocent and guilty alike." We are living in a time where there is a hue and cry for more and harsher punishment for criminals. Perhaps this has some justification, but we should be mindful of the words of Justice Stewart in *Coolidge* v. *New Hampshire,* 403 U.S. 443 (1971), when he said: "In time of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or 'extravagant' to some. But the values were those of the authors of our fundamental constitutional concepts."

A long journey commences with one step and if it be in the wrong direction the intended goal may never be achieved. We must be ever mindful that this is a time of conflict and fear. Keeping this in mind we should make certain that when we take such a step, it is in the right direction. Though it may appear that my step be to the beat

of a different drummer, I am convinced that it is in the right direction, and toward the direction the framers of our Constitution held dear in fashioning the language of the 4th Amendment. It is for these reasons I respectfully concur in the present case, agreeing with the majority's result, but disagreeing with the language restricting the people's right to be free from unreasonable searches and seizures.

FRANK HOLT, Justice, dissenting in part. I dissent to that part of the majority's opinion which holds there is substantial evidence to support the jury's verdict on sixteen of the twenty counts. As I construe the evidence it is sufficiently substantial to support a conviction on ten counts only.